## TAMS *v.* HITNER.

In an action against partners, the articles of co-partnership or of dissolution cannot be read by defendants, to show their respective dates or the firm-name, without calling the subscribing witness.

Where a subscribing witness, three weeks before inquiry for him, was shown to have been at his mother's residence within the state, and about twenty miles distant—if inquiry for him is not made there, there is a want of due diligence to find him, which will exclude proof of his signature.

Nor can the handwriting of a deceased subscribing witness be proved, in order to admit a deed, where there is another witness of whom no account is given.

The name of a firm stated in the *narr.* is immaterial, if a joint contract be proved.

Partners are liable on a note given by two of them by their name as a distinct firm, if, by their course of business, they induced the belief that such was their firmname.

Where the notes of two partners composing a distinct firm are taken for a debt of a firm of which they are also members, the *onus* of showing they were received in payment is upon the debtor.

And this, although the drawers be debtors of the firm for whose debt the notes were given.

In error from the Common Pleas of Montgomery.

*Dec.* 28, 29. The plaintiff brought this action against S. Tams, Livingston and Lyman, the two latter not being served, and declared: first, on two notes dated May 1st and June 6th, 1846, drawn by defendants under the firm of Livingston & Lyman; secondly, on the common counts. Issue was joined on the pleas of payment and the general issue. Some time afterwards, the defendant Tams pleaded that the three defendants traded under the firm of S. Tams & Co., and that the firm of Livingston & Lyman was a distinct firm, of which he was not a partner. In form this was in bar, and the record showed issue was joined. It appeared that the plaintiff had, under a contract with the agent of the three defendants, delivered ore at their furnace up to May 23, and from that time up to June 6, 1846. Upon receiving from this agent certificates of the amount of ore delivered, the plaintiff, under his directions, called at the compting-house of Livingston & Lyman, in Philadelphia, and received the two notes, on which suit was brought, for the amounts of the certificates respectively. The main question was, whether this action could be maintained thereon.

It was proved that the three defendants were partners at the furnace in Montgomery county, and that Livingston & Lyman was the firm-name of a commission house in Philadelphia, composed of two of the defendants. The books and accounts of both concerns were kept there by the same person. On the 23d May, S. Tams

retired from the furnace concern, and it was carried on by Livingston & Lyman, but notice of the change was not brought home to plaintiff according to the verdict.

It was also proved that the firm-name of the three defendants was S. Tams & Co., but plaintiff gave evidence that they were known by those dealing at the furnace as Livingston & Lyman.

The agent of the defendants, during his cross-examination, having stated that his first knowledge of the firm-name of the furnace concern was in the spring of 1846; the defendants produced their sealed articles of co-partnership, which he identified, but the court refused to permit them to read it. In this document, which had a subscribing witness, the witness was named as general agent of the parties.

The defendants then proved a subpœna had been taken out for the subscribing witness to this document. Inquiry for him had been made at his boarding-house in the city, but he had not been there for six months. His cousin said he had been at his mother's, in Bristol, twenty miles from Philadelphia, three weeks before, but not since. No inquiry was made there. The court, on the ground that due diligence had not been used to find him, refused to permit his signature to be proved.

They also refused to permit a person who had seen all the signatures affixed, to subscribe and prove the deed.

The court also refused to permit the articles of dissolution to be read on proof of the death of one subscribing witness, there being no effort to find the other, or proof where he was.

The defendants having proved the separate existence of the two firms, and the good credit of Livingston & Lyman at the time the notes in suit were given, and that they were credited by S. Tams & Co. for the amount of those notes, offered to prove that Livingston & Lyman were indebted to S. Tams & Co., and it was their duty to pay cash instead of giving their notes; which was rejected, but the witness added he did not know that money was ever demanded on these certificates from S. Tams & Co.

The plaintiff was permitted, under exception, to read to the jury the pass-books of his carters, which contained entries of the amount of ore delivered, made by clerks at the furnace after delivery, on proof of the handwriting and identification of the books by the carters, and a refusal to produce the firm's books. The quantity had also been proved by the defendants' agent, who stated the clerks were in New York.

The court also rejected certain records of suits brought by plain-

tiff and others in 1848, against defendants, by the name of S. Tams & Co., where the causes of action accrued prior to May, 1846, to show knowledge on his part of the firm-name, and also by witnesses, plaintiffs therein, who stated they understood the name of the furnace concern was Livingston and Lyman.

KRAUSE, P. J., instructed the jury, that if defendants conducted their business in such a way as was calculated to mislead or induce a belief by plaintiff that the firm-name was Livingston and Lyman, when in fact it was S. Tams and Co., it should be taken advantage of by plea in abatement; but in other respects he was bound to prove his case.

That if the notes taken were those of a stranger, the law presumed they were taken as collateral security, unless shown to have been accepted in satisfaction.

But if the notes were given to bind Tams, by Livingston & Lyman as retiring partners, then they could only do this by using the firm-name, unless specially authorized by him to use another; and the question whether they were authorized to give them as they had done, was left to the jury.

That there might be a recovery on the original cause of action without a surrender of the notes, since, though negotiable, they were expressly declared on, and a verdict either way would bar him.

*V. L. Bradford*, for plaintiff in error.—The paper was evidence to contradict the witness, and properly exhibited to him for that purpose. Having been proved by him, it could be read for that purpose. The ground of objection, that the subscribing witness was not called, only prevails where a deed is to be read against parties, and does not prevail where all the parties admit it, nor where it is not to be used as evidence of a contract: 3 John. 477; 1 Salk. 280; 12 Mod. 500; 2 Bos. & Pull. 85. On the subsequent offer, there was full proof of an ineffectual search for the subscribing witness; and as it is immaterial when the witness subscribes, the court should have permitted it to be done at the trial: 3 W. C. C. 32, 42; 9 Cow. 94.

But the main question is on the effect of the receipt of these notes. They were sued on, and there was a special plea that Tams was not a member of the firm which gave them. This was in fact but the general issue. There was also proof of this fact, and the question whether the drawing firm was indebted to S. Tams & Co., was very material. If they were, then, beside the presumption of payment

arising from the taking notes of strangers, the legal presumption would be payment and a discount of Livingston & Lyman's notes with the proceeds: 12 Mod. 521; Chitty on Bills, 298; 9 Wend. 122; 7 B. & Cr. 19; 6 T. R. 139. It was a voluntary act of the plaintiff, there being no evidence of any desire on his part to receive anything else: 6 B. & Cr. 160; Chitty on Cont. 615, 751; 3 B. & Cr. 842. It was still more material to rebut any presumption of an authority to bind S. Tams by the new note, under a different firm-name; and had it been admitted, the defendant might have shown he was led into error in settling with Livingston & Lyman, by supposing these debts had been paid by them.

The court should have said, if the plaintiff was actually misled as to the firm-name—not if the acts were calculated to mislead.

*Mulvany*, contrà.—The name of the firm was immaterial, if defendants were jointly liable: 2 W. & S. 414; but if there was a misnomer, it was pleadable in abatement. Whether defendants were liable on the notes or the original consideration, would depend on whether they were partners therein, or whether the notes were given by surviving partners for an old debt; or whether, being drawn by strangers, they were accepted in payment. The first two were submitted to the jury, and the latter was devoid of all evidence; for it is the settled rule of this court, that a debtor giving the notes of a third person to his creditor, must show they were given in satisfaction. The *onus* is on him, or they are presumed to be as collateral security: 5 Wh. 537.

COULTER, J.—This cause is one of great volume, in the mass of testimony and the very learned and elaborate argument of the counsel for the plaintiff in error, which, under the new rule, is appended to the paper-book. I shall, however, aggregate the fifteen specifications of error, many of which are not intrinsically of weight, and are made palpable only by the ingenuity of counsel, without detriment, I hope, either to the case or the argument of counsel.

The article of agreement referred to in the first specification was properly rejected by the court, because it was not duly authenticated. The rule is too well established, and too deeply founded in justice and propriety, that the subscribing witness to a deed shall be first called to authenticate it, if he is within the jurisdiction of the court, and can be found upon reasonable search being made for him, to be relaxed or evaded under the circumstances of this case.

The rule itself is conceded by the counsel, but it is averred to

apply only to suits between the parties to the instrument, who have agreed to appoint the subscribing witness as their umpire in contests arising out of its execution. It is very true that in such controversies an admission by the parties in court, during the progress of a trial or on record, is sufficient: 1 Salk. 280. And where a party produces a deed on notice, that itself is an admission in court which obviates the necessity of proof: 6 B. & Cr. 28. These exceptions to the rule go upon the ground that no proof in such cases is necessary, and concern not the degree or nature of proof necessary to authentication. But here the parties to the instrument are all defendants named in the writ, and their admission would be only making evidence in their own behalf; hence the necessity for a rule as strict, with regard to proof,-as if the controversy was adversary between parties to the deed. There is a wholesome rule for the authentication and proof of deeds, and the plaintiff in this suit has an undoubted right to the application of that rule in his case, before a deed produced by the defendants to operate in their behalf can be received. There was not what can be called an effort to produce the subscribing witness. It was not proved that he was out of the jurisdiction of the court; on the contrary, the defendants proved that he was at Bristol, in this state, three weeks before the trial, and there is no account of his having left the state. The offer to prove the deed by a person who said he was present when it was executed, but was not a subscribing witness, and the offer in court to permit him to subscribe the instrument and then call him as the subscribing witness, wears too much the colour of artifice, for the purpose of overbearing a long-established and just rule of evidence, to find much favour. Much better would it be to obliterate the rule altogether, than make it the victim of expedients. All the modes of probate offered by the defendant to prove the agreement were insufficient, and unsustained by any elementary rule or adjudicated case, and therefore there was no error in the rejection of the paper.

It is strongly urged in the argument, that the date of the paper would have contradicted the testimony of Lewis, the plaintiff's witness, who admitted it to be genuine, and that therefore it ought to have been admitted. But this is a mistake: Lewis says he did not know the firm-name until in the winter or spring of 1846. And the articles of agreement were dated 25th October, 1845, and stated that the firm-name should be Sampson Tams & Co.

Lewis, however, states, that in December, 1845, Lyman bought out Patterson, having a short time before bought out Livingston,

and some time in the winter of 1846, Livingston bought back his share and also one-half of Patterson's share, from which it would appear that the members of the firm were ambulatory till the winter of 1846, and it was in February that Lewis said the name of the firm as Sampson Tams & Co. was first given to him.    The instrument would, therefore, not have contradicted him, because he might have first known of its existence after February, 1846 ; but if it was intended to do so, there was still stronger reason that it should be authenticated and proved according to settled principles. The pass-books were competent evidence, when proved by the carters who kept them.    They contained entries made by the recognised clerks at the furnace, of every load of ore hauled and delivered by each carter, as evidence of the amount delivered.    They were, in fact, not secondary evidence, but the very best evidence the nature of the transaction admitted.    When the defendants, however, declined to produce the books of the furnace, upon notice, to compare with them, all shadow or doubt passes away, and the pass-books become the true criterion.    It is sufficient to say in relation to the records of suits offered in evidence by the defendant, that, although the cause of action may have originated prior to May, 1846, yet that afforded no evidence whatever that the plaintiff knew before that time that the firm-name of defendants was Sampson Tams & Co., because the suits were not brought until 1848, before which time, the neighbourhood had learned the firm-name as it was christened in the winter of 1846, and communicated to Lewis only, who was the agent and manager of all those interested.    They cannot carry back the *scienter* further than the institution of the suits, and were properly rejected.

The plea filed by the defendant Sampson Tams, on the 21st February, 1848, and which the plaintiff treated as a nullity, was clearly a plea in abatement, and not a plea in bar.    The suit is instituted against Walter C. Livingston, Charles A. Lyman, and Sampson Tams, trading under the firm of Livingston & Lyman ; and the defendant Tams, upon whom only the writ was served, pleads to issue and in bar.    About one year afterwards, he pleads specially, that Livingston, Lyman, and himself, carried on business at the furnace under the firm of Sampson Tams & Co ; and that he was not a member of the firm of Livingston & Lyman.    He does not deny the joint contract which the plaintiff alleges, or put that in issue by this plea, but says he did not make it under the name of Livingston & Lyman, of which firm (which transacted business in Philadelphia) he was not a member.

It is therefore a plea of misnomer, and of course a plea in abatement, which could not be pleaded after a plea in bar, by which the misnomer, if any, was waived, and the plaintiff was entitled to treat it as a nullity : Wilson *v.* Hamilton, 4 S. & R. 238 ; Chamberlin *v.* Hite, 5 W. 373. Indeed, a plea in abatement is too late after a general imparlance.

The defendants were sued, and all· named as joint contractors under the firm of Livingston & Lyman. The firm-name is totally immaterial, if the defendants made a joint contract. That is the gist of the matter, and that is not denied by the special plea, but in fact impliedly admitted that the joint contract was made under the firm of Sampson Tams & Co. It is fully in evidence, that at the time the contract was made with the plaintiff, the firm name was generally believed to be Livingston & Lyman, and Lewis, who was agent and manager at the furnace, received many notes signed Livingston & Lyman, for the purpose of delivering to those who had worked there while Tams was a partner ; and when he settled with others, gave them a certificate of indebtedness, with directions to go to Livingston & Lyman, two of the firm who transacted business in Philadelphia, and either get pay or get their notes. But there is no evidence whatever that the plaintiff knew, as long as he delivered under this contract, of there being distinct and separate firms. Tams was often on the ground, interfering with the business, and there is not a scintilla of testimony that the plaintiff knew that he retired from the firm in May, 1846, after which some of the ore was delivered.

The real question is, were all the defendants named partners in the business and transaction at the time the contract was made with plaintiff by Lewis, their agent, in February, 1846 ? Haughey *v.* Strickler, 2 W. & S. 414. That was the only issue the plaintiff was bound to maintain, and of this there is no doubt whatever, from the testimony of the manager and agent at the furnace, as well as the testimony of other witnesses : nor is there the slightest evidence that the plaintiff received notice to quit delivering ore at any time, according to the stipulation in his contract, at or after the 23d May, when it is alleged Tams went out of the firm. But the court submitted it as a fact to the jury to determine whether or not Tams, Livingston, and Lyman, by their mode and manner of doing and transacting business at the furnace, held out the impression that they transacted business under the name of Livingston & Lyman. It is very certain that it is a matter of no consequence what the name of the firm may be in the articles of

partnership, which may be unknown to the public. It is the ostensible name under which business is transacted, that the public know, and all that is covered or represented in business life by that name, are bound. By whatever name an association is known in their dealings, by that they are bound, no matter what their designation may be in their articles of partnership: Story on Part. § 192. The notes given by Livingston & Lyman to plaintiff, on account of ore delivered at the furnace, were not *ipso facto* payment *pro tanto*, even though they were given by two of the partners only. If they were received as satisfaction and payment from Lyman & Livingston as a different firm, and intended to operate as a discharge of Tams, then, to be sure, they would extinguish the original demand. But there is no evidence whatever that they were so taken, nor that they were taken in any other than the usual course of business, by which the employer gives his note as evidence of the demand, or of the services rendered. That is the fair interpretation of the transaction, and in that aspect they are only additional evidence. If the notes were not taken as collateral security, but in payment and satisfaction, it was the duty of the defendant to show it. The burthen of proof was thrown upon him: 5 Wh. 537. The jury found the fact the other way.

Livingston & Lyman, after the alleged retirement of Tams, continued to carry on business at the usual place, and, as admitted, had authority to settle up the concern. Under that authority they might have lawfully executed a note, which would be valid against all the partners existing at the time of the dissolution: Robinson *v.* Taylor, 4 Barr, 242.

Upon this whole case no mind can hesitate as to the justice of the plaintiff's demand. Mr. Lewis represented all the partners, in every stage of their mutations. The aspect of business appeared to be the same, and people contracted more with the furnace than with any ideal names. The plaintiff was bound to prove the joint contract by the issue, and the instruction of the court. The defendants have received the commodity out of which they made profit, from the labour and industry of the plaintiff, and the court perceive no rule of law that will prevent him from the benefit of his verdict and judgment.

Judgment affirmed.